UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA        :        CRIMINAL NO.  07–190

:

JERMAINE GRIFFIN                               (JDB)

**DEFENDANT'S MEMORANDUM   IN AID OF SENTENCING**

Comes now the defendant herein, Jermaine Griffin, by and though his undersigned counsel, and hereby respectfully files the instant Memorandum in Aid of Sentencing.

**Procedural Posture**

Jermaine Griffin was indicted on one count of possession with the intent to distribute crack cocaine.  This event was alleged to have occurred on or about July 10, 2007, when Mr. Griffin was stopped by a Park Police Officer in the 1300 block of Perry Place, N.W.  A search of the vehicle he was driving turned up a seven-up can with a false top containing several 8-balls of crack cocaine and larger chunks of crack concealed underneath the cupholder in the console portion of the vehicle, along with $980 in cash in the center console itself and $414 seized from the defendant's person.

After trial, the jury rendered its verdict convicting Mr. Griffin of the single count in the indictment.

**The Guidelines Calculations**

At the outset, this Court must consult the now-advisory U.S. Sentencing Guidelines, Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Dorcely, 454 F.3rd 366, 375

1

(D.C. Cir. 2006 ("In the post-Booker world, the. [sentencing court] must "calculate and consider the applicable guideline range but is not bound by it."); 18 U.S.C. 3742(f);. United States v. Pickett, 475 F.3d 1347 (D.C. Cir. 20007).

Given that Mr. Battle has a criminal history category of III, his guideline range for the offense of conviction, the amount of drugs being 379.9 grams of cocaine base under the evidence given by the DEA chemist at trial, should be 151-188 months (12.6 -15.6 years), aggregating all drug quantities from the various places in the vehicle. [1]

**The 3552(a) Factors**

The pre-sentence report has clearly set out in order the well-known factors for the Court to consider under 18 U.S.C. Section 3553(a ). PSR at para. 79, p. 17.  Undersigned counsel will not repeat the categories of consideration here, but will address those which are pertinent on the facts.

History and Character of the Defendant [2]

While Mr. Griffin was convicted of a drug offense, PWID crack cocaine, the offense in no way involved violence or gun-carrying, nothing of a "dangerous" nature whatsoever on Mr. Griffin's part.  No firearms or ammunition were found in the vehicle, nor was Mr. Griffin in possession of any such items.  No search warrants turned up any such items, either.

---

[1] By making this calculation and by allocuting for the best possible sentence for her client, undersigned counsel in no way relinquishes her position and request at trial that, post-Booker, the Court should have given the jury a verdict form containing special interrogatories to delineate which quantities of drugs they were convicting on, if any, and where those were located in the car.

[2] For discussion of Mr. Griffin's arrests and convictions, see below, under 'Just Punishment and Adequate Deterrence."

2

It should be remembered, too, that – as noted in the pre-sentence report - Mr. Griffin worked assiduously in his father's company, specifically as a drywall mechanic and painter, after his release from his prior sentence. He worked as much as he could, but still, given the business his father is in, Mr. Griffin's income was dependent upon the availability of contracts. According to Mr. Griffin's father, Tilman Powell, whom undersigned counsel interviewed at least four times prior to trial, Jermaine was a really fine painter, pleasing the customers very much with the quality of his work, his assiduous work ethic and his mild and genial manner. Yet, business was spotty, as is so often the case in the construction industry for small contractors, and so, although his father paid him well when work existed, there was not enough work to qualify as "full time" employment.

Mr. Griffin also sought additional work, but had much trouble breaking into the working world which provides a regular paycheck because of his prior felony conviction. As the Court knows from both the evidence it heard at trial (from Mr. Griffin's wife, Lateisha, her close friend from church, Tushema Collins, and various other relatives and friends), Mr. Griffin is deeply dedicated to his children. Upon release from prison and his marriage, he had not only his own children to support but those of his wife, as well. This was a heavy burden to bear and certainly a great stressor, but one which he gratefully undertook, as he could do little for them while in prison, except visit with them and talk with them on the telephone. His release from prison gave him the opportunity to serve them in more complete ways.

He had tried so very hard to put his life back together, according to his family: after he was released from his federal sentence. In August of 2006, he formally married his long-time

sweetheart, Lateisha O'Brien Griffin, [3] taking her young children into his life as though they were his own. He kept close tabs on his two teenage daughters, spending a great deal of time with them at his and his wife's home and at extracurricular school activities. He comforted his wife who had lost a young 2-year old son to illness, and eventually gave her another son, who is now nearly a year old. Every single day he took not only his own children but those of neighbors to sports practice late in the afternoon, and coached, as well. He counseled the children and young adults to behave respectfully, act soundly, exercise good judgment and not to get into trouble. He remained with the children until he dropped them off at their parents, or, in the case of his own and his wife's children, brought them home at about 8:30 p.m.

Every weekend, he visited his aging grandmother, Hazel Powell, (on Perry Place), whom undersigned counsel also interviewed pre-trial, along with his aunts. He often ran errands for them during the week, driving across town to assist his grandmother when he was not working. He drove his wife to work every day that he was not working, in order to lower her stress levels, as she was both working and raising young children, and carried a heavy load herself, and driving in rush hour bothered her immensely.

Living in this fashion is commendable for someone who grew up as Mr. Griffin did - - in Barry Farms with his mother on crack, [4] his younger half brother gone quite wild, in a house

---

[3] The Addendum to the PSR at page 20, para. 2, in presenting the history and character of the defendant, mistakenly asserts that "Defendant Griffin" never married." This is contradicted in three ways: by the facts presented at trial, by the facts presented during the pre-sentence interview and in paragraphs 43 and 44, at page 11 of the same author's pre-sentence report.

[4] The pre-sentence report writer in the Addendum notes only that the defendant "recalled seeing his mother use crack." Undersigned counsel was present for the PSI interview and specifically recalls the defendant telling the report writer that his mother used crack throughout

4

which his mother kept full of people (all of them drugs addicts and sellers), and his father nowhere in evidence. [5]  Thus it is that, even accepting for the present the jury's finding of guilt on the July 10th offense, Mr. Griffin needed to make decent money to fill in the gap when jobs with his father were small or scarce, in order to be a good father to his children and a good husband to his wife.

Accepting the jury's guilty verdict as we must at this point in time, it would appear that this incident does not represent a longstanding pattern after the defendant's return from jail.  This is borne out by the fact that, at his arrest, Mr. Griffin had nothing of great value whatsoever: no fine clothing, no closet full of expensive tennis shoes, no jewelry, no fancy car (the Chevy Tahoe belonged to his wife and he bought a car at auction), nothing of the nature typically possessed by a mid level distributors of crack acting in this capacity steadily.

It should be noted as well that Mr. Griffin's father always maintained to undersigned counsel that he had paid Mr. Griffin the day before this incident, in cash, both for work performed and to purchase materials for the next job, in an amount which more than covered the

---

the time he was growing up.  He thereafter said during the interview, when asked, as is reported in the PSR at pra. 40, p. 11 that he "recalled his mother began using crack cocaine in the late 1980's," although he admitted he is not good with dates and time frames.  His unmistakable point was that his mother was a drug addict while he was growing up and lived the lifestyle of an addict.

[5]   This is a discrepancy between the pre-sentence report and the Addendum.  The Addendum erroneously reports that Mr. Griffin's father was involved in his rearing, and provided financial support for the family.  This is in contradiction to the facts in the body of the report itself and the facts of the defendant's father's life.  Although he became involved in his son's life when Jermaine returned from prison, Mr. Powell was only very peripherally involved prior thereto.  The report itself notes that Mr. Griffin's father was an alcoholic during the years when he was growing up, and that his father and mother separated, permanently, when Mr. Griffin was only 4 years old.  The defendant was left with his mother.  PSR p. 11, para. 39.

cash found at arrest.  Nonetheless, Mr. Powell would not testify at trial, as he had an old conviction for which he had served time and had been on parole for a fairly long period.  That, coupled with the fact that he runs a cash based home improvement business, caused him to worry that having successfully rehabilitated his own life completely, he would "get in tax trouble" for paying his son in cash and for running a cash business.  Thus, undersigned counsel was debarred from proving to the jury at trial where the money came from that Mr. Griffin had, an important element of the conviction.

<u>Just punishment for the offense and Adequate Deterrence</u>

Undersigned counsel submits that, as to the need for the sentence to reflect the seriousness of the offense, that there should be a difference between those who commit crimes purely for selfish economic gain, and those who are having a very difficult time working their way into the regular working world, and resort to drug sales as a short term resolution (or, indeed, as when he was young, to keep body and soul together).  It is almost as tragic that we provide little, if any, support as a society to  ex-offenders, leaving them to their own devices to put back together their broken lives and to surmount the burden of their lives and prior convictions, as is the fact that the ready availability of street drugs brings about and perpetuates addiction with all of its ills.   If Mr. Griffin sold drugs, he falls into the latter, rather than the former category of seller.

**Prior Offenses and Arrests**

As for his contacts with the Criminal Justice System, Mr. Griffin has indicated to undersigned counsel that there are a number of mistakes in the narratives reported out in the pre-

6

sentence report. Regarding the offense in paragraph 26 (Possession of Cocaine), the narrative indicates that there were weapons in "the defendant's residence." This was the defendant's mother's residence, not Mr. Griffin's exclusively by any means. Mr. Griffin lived there with his mother, his half sister and brother, Darlene and Marcus, with multiple "friends" of his mother, etc. There were 13 people in the house when the police entered. When the case sorted itself out, persons not even related to the family in any way were convicted of possessing the firearms mentioned. Thus, the fact of this offense should not be held again Mr. Griffin. Given these facts, the Government understandable permitted Mr. Griffin to plead guilty to misdemeanor drug possession and he received probation, which he successfully completed probation.

In a second misdemeanor drug possession case incurred by Mr. Griffin at age 22 and reported at paragraph 27 of the PSR, Mr. Griffin was sentenced to six weeks in prison, and again successfully completed 18 months of probation in that case.

In the final (and clearly most serious conviction), Mr. Griffin was acquitted (and rightfully so) of homicide, but ultimately convicted of threats to injure a person, after a second conviction for obstruction of justice was reversed by the Court of Appeals. Mr. Griffin notes that the narrative, ascribing to him very serious threats to Ms. Hayes on two occasions, is in error. He was held in jail at the time both these events actually occurred (indeed from the time of his initial arrest and presentment). His brother Marcus committed and was convicted of these offenses.

Further, he never "admitted to Ms. Hayes that he had killed Mr. Kibler," the victim in the case. Mr. Griffin's position was clearly adopted by the jury, which acquitted him of the homicide, and all related firearms charges.

In homicide cases, it is a long and variable road from the initial police documents (which are what the pre-sentence report writers use for their narrative accounts) to the actual evidence at trial, after many, many witnesses have been located, interviewed and testify. It can thus be problematic and potentially unfair – as it most clearly is in the instant case – to use the initial police version of events to cast very serious negative aspersions on the defendant's character via repetition in the PSR. See the statement "Though he was acquitted of the murder charge, it appears that when provoked, the defendant resorts to violence as a means of resolution," PSR P. 20, "Justification" para. 3. There is no justification for this statement whatsoever, save a bare-bones scanning of the initial police report.

Even more unfair is the probation office's use of police reports to ascribe to the defendant *as though true* dismissed and no-papered conduct, thus arriving at the unfounded and untrue implication the defendant since the age of 14 has been involved with drugs, weapons and assaultive conduct." (See statement, Addendum, p. 20, para. 1, "And, as noted throughout this report, the defendant's criminal record commenced when he was fourteen years old, and is replete with drug, weapons and assaultive arrests."

In this regard, the defendant had two juvenile adjudications, one for drug selling and one for UUV. He further had an RSP arrest which was no papered (or, "not petitioned," in the parlance of the juvenile system). None of these involved weapons or assaultive conduct of any kind.

His three adult convictions have been discussed, and do not involve weapons or assaultive behavior.

Of his adult arrests, the 1992 arrest for alleged threats to the police officer writing a

ticket on his car were no papered, indicating a complete lack of evidence and justification to go forward with the case. The 1993 arrest for carrying a pistol without a license (reported, for unknown reasons, as "National Firearms Act," in the PSR at para. 35.) was dismissed. The defendant informs undersigned counsel that, in that case, he was the driver of a car which was stopped, and a firearm was found in the rear of the car at the feet of a rear seat passenger. It was not visible to Mr. Griffin and he was not aware that his passenger entered the car with it. Hence the appropriate dismissal of the case against Mr. Griffin.

The 1993 gun and drug arrest (for which there is no information whatsoever, according to the PSR at p. 10, para. 36), was not Mr. Griffin's. He had another pending case at the time this para36. offense devoid of information is reported to have occurred , the one in paragraph 35 (dismissed *with* prejudice) in which he was held pre-trial at D.C. Jail. Thus, the pre-sentence report ascribes this period of pretrial detention to the wrong case. In any event, the case (not Mr. Griffin's) described in paragraph 36 of the PSR was dismissed.

Finally, the assault with intent to kill case lasted all of two months, despite the seriousness of its charges, at which time on the Government's motion, it was dismissed. It thus should also not be counted against Mr. Griffin.

Leaving aside the arrest that was never Mr. Griffin's,. it would be one thing if any of the 4 remaining arrests involving weapons or alleged assaultive conduct resulted in a conviction for either weapons possession or assault. But that is not the case. This Court did not sit on those cases, and has no viable means of assessing the allegations which were either no papered or dismissed, except to know that they were not found worthy in the Court system of proceeding any further than they did. Thus these arrests should not counted against Mr. Griffin as a

9

negative 3553(a) factor.

As for the acquitted conduct in the murder case, again, the Court did not preside over that trial and cannot therefore assesses the acquitted conduct against Mr. Griffin, but rather, in all fairness, should honor the jury's verdict and give Mr. Griffin the benefit of those acquittals in taking into account the character and history of the offender under 3553 (a).

Based upon all the foregoing arguments, if this Court decides to impose a sentence based upon the sentencing guidelines, undersigned counsel asks this court to impose a sentence at the very lowest end of the guidelines, of 151 months, or 12.6 years). [6]

**Crack/Powder ratio**

Just Punishment and Respect for the Law and other 3553(a) factors

Furthermore, Mr. Griffin objects to any sentence predicated upon the current crack/powder ratio now in effect and justifiably under so much attack and scrutiny by the U.S. Sentencing Commission and the Congress alike, with a variety of bills currently pending in the Congress to alleviate the gross inequities brought about by the disparity. See Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Pickett, *supra,* and discussion in both cases critical of the crack/powder ratio and its origins, and discussing at length the Sentencing Commission's efforts to eliminate and/or substantially change the crack/powder ratio. As Pickett so bluntly noted, as to the crack/powder ratio, ". . . the Commission is one of its severest critics.

---

[6] This is without, of course, waiving the arguments made under Kimbrough and Pickett, below.

In its 2002 Report, the Commission ". . . firmly and unanimously believes that the current federal sentencing policy is *unjustified and fails to meet* the sentencing objectives of 3553(a). 2002 Report at 91." (Emphasis supplied). The court went on to note that as its reasons that " . . . [f]or one thing, "[c]racks's unique distribution in combination with the 100:1 quantity ratio, can lead to an0maous results in which retail crack dealers get longer sentences than the wholesale dealers who supply them with the powder cocaine from which their crack is produced." 1995 Report at 174. Although crack is more addictive than powder cocaine, the 1001-1 ratio 'greatly overstates the relative harmfulness of crack cocaine. 2002 Report at 93.'"

     The Pickett Court goes on to make another point important to the instant case. "The disparities are not only between crack and powder cocaine dealers." In the Commission's opinion 2D1.1 of the Guidelines is also a failure in distinguishing among crack offenders. The Guideline treats 'all crack offenders as if they committed [harmful conduct such as violence] even though most crack cocaine offenders in fact had not. Id at VII.' "

     Next, the Court makes the point that . . . 2D 1.1's use of the 1001:1 ratio and its quantity based approach threatens 'public confidence in the federal courts' because it has had a disproportionate impact on African-American offenders, who in 2002 made up eight-one per cent of those sentenced for trafficking crack. 2002 Report at 131, 135. ' "

     Finally, the Pickett court evinces clear sympathy and support for the Sentencing Commission's belief that "its Guideline for crack distribution generates sentences that are 'greater than necessary,' exaggerates 'the seriousness of the offense' of crack trafficking, does *not* 'promote respect for the law,' and does not 'provide just punishment for the offense.' " (emphasis supplied).

Despite the meager two level reduction ultimately proposed by the U.S. Sentencing Commission (after being continually rebuffed by now-interested Congress when proposing greater reductions all the way down to 1;1)), accepted by the Congress and now in effect, as Kimbrough is at pains to point out, the crack powder ratio still ranges between 25-1 and 80-1, giving high level sellers of powdered cocaine far lesser sentences than those found guilty of selling or possessing with intent to distribute crack. Based upon all the literature and argument that has been produced as to the inequitable racial and other disparities produced by this sentencing scheme, Mr. Griffin, as a 3553 (a) factor, asks that the Court, in recognition of the great disparity produced by the crack guidelines, sentence Mr. Griffin to the statutory mandatory minimum sentence of ten years, making a determination that a "within-Guidelines"sentence would be "greater than necessary to serve the objectives of sentencing."

Undersigned counsel asks this pointing out the following: if the Court were to use the 1:1 ratio, eliminating any disparity between crack and powder cocaine at sentencing, in determining Mr. Griffin's guideline level, this would result in a base level for this case of 22, and, with a criminal history category score of III, a guideline range of 51-63 months. U.S.S.G. 2D1. ( c)(9).

Looking at the disparity, Mr. Griffin would have had to sell 5000 grams of powder cocaine (5 kilos) to even be subject to the mandatory 10 year minimum that he now is subject to with the vastly lower amount of 379.9 grams of crack.

As it is, the mandatory sentence of ten years to which Mr. Griffin is subject is itself nearly twice what a person selling powder cocaine in Mr. Griffin's position would receive under the just recited heavily skewed guidelines, without the seller of powder ever remotely facing a mandatory minimum ten year sentence at the 379.9 quantity.

In addition, the guidelines sentence for crack at both its upper and lower levels (151-188 months) is virtually three times (2.96 times) what the lowest guideline value is for the selling or felony possession of the same amount of powder cocaine. Indeed, under the U.S.S.G. Level 34, which is where the defendant starts out with the quantity of 379.9 grams of crack, he would have had to sell between 15 and 50 kilos of powder cocaine to be placed at the same starting level. Given these values, the imposition of a guidelines sentence would clearly result in a sentence "greater than necessary" to accomplish the purposes set forth in 18 U.S.C. 3553(a) and would perforce exemplify the unjust effect that crack cocaine guidelines have at sentencing. *See* Kimbrough; Pickett, *passim*.

As the United States Sentencing Commission itself has found, after studying the question very closely over the course of at least thirteen years, the crack/powder disparity is not just "inconsistent with the 1986 Act's goal of punishing major drug traffickers more severely than low level dealers" (1995 Report of the Sentencing Commission at 66-67) but *in addition* "fosters *disrespect* for and lack of confidence in the criminal justice system" because of a "widely held perception" that it "promotes unwarranted disparity based on race." (2002 Report of the Sentencing Commission at 103) (emphasis supplied). This precise "unwarranted disparity" is visited upon Mr. Griffin by imposition of a "within-Guidelines" sentence, because of the enormous disparity between the amount of powder cocaine which a seller would have to sell (or would be permitted to sell and still remain in Mr. Griffin's guideline range), and the amount of crack cocaine sold by Mr. Griffin in order to come within the same guidelines sentencing range.

As the US Sentencing Commission has repeatedly found since 1995, the guidelines, in the context of the crack/powder disparity, have failed to meet the objectives of the 1986 Act, and

13

clearly do not promote respect for the law but rather make a travesty of the law, particularly given that the reasons that the 100:1 crack/powder ratio was put into effect have long since been shown to be deeply flawed, not to mention the unseemly racial disparity that has been wrought by the guidelines.  See Kimbrough, *passim.*

The pre-sentence report writer argues that a sentence within the guideline range of between 151 and 188 months (specifically 180 months) "takes into account the amount of crack cocaine for which the defendant is accountable, his criminal record and his refusal to accept responsibility."  Addendum at p. 21.  Yet, a similarly situated seller of powder cocaine with the same criminal history, the same amount of powder cocaine and similarly convicted after trial would receive a sentence of between 51 and 63 months for exactly the same conduct, with exactly the same sentencing factors under the guidelines.  Moreover, a similarly situated seller of powder, with all the same sentencing factors (taking into account the two level adjustment Mr. Griffin receives from the crack amendment) would still have to sell between 5 and 15 kilograms of powder cocaine to be in his same sentencing range, that is, between 5000 and 15,000 grams of powder cocaine, to face even a mandatory ten year sentence, much less the 151-188 months mandated by level 32 when one has a criminal history score of III.

Given this disparity, a guidelines sentence for Mr. Griffin does not do justice, but rather both highlights and imposes upon Mr. Griffin the disproportionate and unjust effect of the sentencing guidelines under the current crack/powder ratios.  It certainly does not promote respect for the law, and is far in excess of what is reasonably necessary to accomplish the purposes of sentencing.

For all of the above stated reasons, Mr. Griffin's counsel respectfully requests that he be sentenced to the mandatory minimum sentence of ten years.

Respectfully submitted,

_____/S/_____
Frances M. D'Antuono
Unified Bar No. 358141

218 7th Street, S.E.
Washington, D.C. 20003
(202) 544-7633
(202) 544-6332 (Cell)
fdantuono@msn.com

Counsel for Jermaine Griffin

**Certificate of Service**

I hereby certify that a true and accurate copy was served by electronic filing upon Edward O'Connell, Esquire, United States Attorney's Office, Narcotics and Organized Crime Section, 555 4th Street, N.W., Washington, D.C. 205530, and upon the chambers of the Honorable John D. Bates. United States District Judge and Presiding Judge in the case, this 24th day of June, 2008.

_____/S/_____
Frances M. D'Antuono